UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ANNABEL,

        Plaintiff,

v.

JORG ERICHSEN, et al.,

        Defendants.

_____/

Case No. 2:15-cv-10345

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING IN PART**
**AND DENYING IN PART DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION TO DISMISS [99]**

On January 26, 2015, pro se plaintiff Robert Annabel ("Annabel") filed his civil rights complaint alleging that prison officials at the Macomb Correctional Facility ("MCF") violated various constitutional provisions and state laws. In May 2016, the Court referred all pretrial matters to Magistrate Judge Davis. ECF 22. The Court later rescinded the order of reference as to dispositive motions. ECF 106. There are two dispositive motions currently pending. The Court will address only the motion for summary judgment, or in the alternative, motion to dismiss. ECF 99. For the reasons stated below, the Court will grant in part and deny in part Defendants' motion.

**BACKGROUND**

I.   <u>Procedural History and the Parties</u>

Annabel filed his complaint on January 26, 2015. The Court initially dismissed the complaint under the Prison Litigation Reform Act's "three strikes" provision. ECF 6. Annabel filed a motion for reconsideration, ECF 9, and a notice of appeal, ECF 10. The Court granted Annabel's motion for reconsideration, reopened the case, and granted

Annabel in forma pauperis status. ECF 16, 19. The Court's grant of reconsideration rendered Annabel's appeal moot. ECF 17.

Then, the federal Marshal Service served eleven defendants, who each waived service. ECF 27–34, 36–38. The Marshals were unable to serve four defendants: Jorg Erichsen, and Corrections Officers ("CO") Weberg, Robbinson, and Brown. ECF 23–26. Erichsen returned a waiver of service on March 3, 2017. ECF 69. Over the course of more than one year, the Court attempted to effectuate service on Weberg, Robbinson, and Brown. *See* ECF 45, 47, 54, 57, 65, 86, 89, 101, 102, and 110. Neither Robbinson nor Brown could be served, ECF 95–96, and the Court dismissed them from the case, ECF 101. Weberg returned a waiver of service on November 20, 2017. ECF 113.

In sum, the Marshals successfully served thirteen defendants: Jorg Erichsen; CO Weberg; and the "MDOC Defendants." The MDOC Defendants include: COs Antwan Oden, Thomas Jordan, Jorge Lebron, Kenneth Loftis; Sergeant James Haggerty; Grievance Coordinator Eutrilla Taylor; Mental Health Therapists Janice Stewart and Scott Webster; Deputy Wardens Darrell Steward and George Stephenson; and Warden Kenneth Romanowski.[1]

During the protracted service period, the parties filed numerous motions that the Court addressed. First, on September 6, 2016, the MDOC Defendants filed a motion for summary judgment or motion to dismiss. ECF 43. On September 22, 2016, Annabel filed a motion for leave to file an amended complaint, ECF 48, and an amended complaint,

---

[1] Annabel neither listed the first names of any of the defendants nor spelled all names correctly in his original complaint. His amended complaint properly lists all MDOC defendants and the Court uses those spellings. ECF 49, PgID 356–57.

ECF 49. Annabel subsequently filed a response to MDOC Defendants' dispositive motion on October 24, 2016. ECF 58. The MDOC Defendants replied. ECF 60.

On August 25, 2017, Magistrate Judge Davis filed a report and recommendation suggesting that the Court grant Annabel's motion for leave to file an amended complaint and deny the MDOC Defendants' motion for summary judgment on the issue of exhaustion. ECF 91. The Court rejected the Report and Recommendation because both motions were moot. ECF 97. The MDOC Defendants filed a motion under Rule 12(b) and "Annabel filed an amended complaint within 21 days." *Id.* at 760. Pursuant to Rule 15(a), therefore, "Annabel [was] entitled to amend his complaint as of right." *Id.*

Second, in April 2017, the Court addressed several other Reports and Recommendations, overruled Annabel's objections to the Reports, and affirmed Magistrate Judge Davis's orders on a motion to compel, a motion to strike, and a renewed motion for recusal. ECF 74, 76. Annabel filed a notice of appeal on May 8, 2017. ECF 78. The Sixth Circuit dismissed the appeal as premature. ECF 85.

Third, Weberg filed an unopposed motion for summary judgment, which the Court granted. ECF 122, ECF 125–26. As a result, only twelve defendants remained active litigants in the case: Jorg Erichsen and the MDOC Defendants.

On October 10, 2017, the MDOC Defendants renewed their motion for summary judgment or motion to dismiss. ECF 99. Annabel responded to the motion. ECF 103. In the hopes of preserving judicial resources—given the case's extraordinarily heavy motion practice[2] and that the MDOC Defendants' renewed motion for summary judgment was

---

[2] As of May 2018, the parties filed twenty-nine motions, six objections to various Reports, four letters, and two notices of appeal.

identical to its previous, mooted filing—the Court rescinded its order of referral to Magistrate Davis for resolution of the dispositive motions. ECF 106.

II.    Facts of the Case[3]

On December 2, 2013, Erichsen assaulted Annabel after Annabel "jokingly" locked a fellow prisoner in a shower. ECF 49, PgID 358. During the encounter, Erichsen said, "You fuckhead, now I have to go get the key! How about I lock you in there, bitch!" *Id.* Plaintiff contends that a DVD of the event existed. *Id.* at 359.

After Annabel reported the incident, his injuries were treated and photographed. *Id.* at 358–59. Plaintiff then filed a grievance for the assault, MRF-12-12-1179-26a. Plaintiff suggests that MDOC failed to comply with the grievance policy in responding to the grievance. *Id.* at 359. Further, Plaintiff expressed to MDOC inspector K. Steece a desire to press criminal charges. *Id.*

Then, on December 12, 2013, COs Oden, Weberg, and an unknown officer called Annabel a "snitch." *Id.* at 360. Annabel feared that the other prisoners would interpret the statement to mean he was a snitch against them rather than a snitch against Erichsen. *Id.* at 360. If interpreted that way, he suspected that the other prisoners would attack or harass him. *Id.* Annabel responded by filing a grievance, MRF-13-12-1225-17b. Annabel maintains that during its investigation of the incident, MDOC failed to interview an identified witness. *Id.*

One week later, non-party Jordan asked Annabel a question about "privileged information formally disclosed only to Sergeant Kelly, Inspector K. Steece, and Deputy

---

[3] Given the summary judgment standard to be employed, the Court recounts the facts in the light most favorable to Plaintiff. The summary is not a finding of fact.

4

Warden Stewart." *Id.* at 361. Annabel avers that non-party Jordan's question demonstrated Grievance Coordinator Eutrilla Taylor disclosed privileged information and that the disclosure evidenced Taylor's corruption. So, Annabel filed a grievance, MRF 14-01-0056-28e. Taylor rejected that grievance as vague, which Annabel believes further evidences her corruption. *Id.*

On January 14, 2014, COs Jordan and Lebron stopped Annabel as he proceeded to a therapy group. *Id.* at 360. Jordan told Plaintiff: "You aren't going to any groups today, because you should have kept your mouth shut about [Erichsen]. Go in there (the Unit 7 dayroom), and I'll write you a threatening behavior, and you'll be down on A-wing." *Id.* That day, Annabel submitted a grievance to Inspector Steece. *Id.* at 361.

Then, before dinner on January 19, 2014, CO Loftis checked Annabel's ID at a guard station. *Id.* at 360–61. During the exchange, Loftis told Annabel, "I'm not going down like [Erichsen] did." *Id.* at 361. The next day, Annabel filed another grievance with Inspector Steece. *Id.*

Sergeant Kelly interviewed Plaintiff about the incidents and determined that there was insufficient evidence to discredit staff. Plaintiff received neither grievance receipt identifiers nor Step I Responses, which foreclosed appeal. *Id.*

On January 28, 2014, Annabel submitted a written complaint to "the Unit 7 non-white prisoner unit representative" and asked him "to raise as issues at the Warden's Forum" that Grievance Coordinator Taylor failed "to provide Step I receipt identifiers" and Step II Appeals forms. *Id.*

On February 1, 2014, Annabel wrote a letter to Inspector Steece expressing concern for his safety at the facility because of staff conduct. *Id.* at 362.[4] The next day, Annabel requested grievance forms from CO Brown[5] who suggested that Annabel could retrieve them from the desk. Instead, Brown allegedly ordered Annabel into a shower cage, drew his Taser, and pushed Plaintiff into the cage. *Id.* at 361–62. Brown kept Annabel in the shower cage for more than ninety minutes. *Id.* at 362. During the interaction, Annabel remembered Erichsen's assault and felt punished for filing the grievance against Erichsen. Plaintiff also recalled a painful experience he had with a Taser. *Id.*

On February 3, 2014, Annabel complained to his treating psychiatrist of an upset stomach. He identified the staff's treatment of him as the source; the psychiatrist suggested that Annabel's decision to stop taking medication prompted his stomach pain. *Id.* at 362.

Soon thereafter, Plaintiff returned to his unit but prison staff locked him in a "shower cage, stripped him of his clothes, and placed him in a suicide observation cell" without explanation or authorization. *Id.* at 363. Earlier that day, unknown prison staff had packed Annabel's property, discarded his eyeglasses and books, and discovered "contraband

---

[4] The timing of the letter seems confusing. Annabel contends that the shower incident with CO Brown occurred on February 2, 2014. ECF 49, PgID 361. He then states that after the incident and "[u]pon returning to his cell, on February 1, 2014, Plaintiff immediately wrote Inspector K. Steece" the letter. *Id.* at 362. The Court will use the February 1 date because Plaintiff explicitly provided the date of the letter.

[5] The Court dismissed Brown for failure to serve. The Court includes the allegation only because it relates to Annabel's supervisory liability claims.

metal." *Id.* Annabel filed a grievance for the incident, MRF-14-03-0373-19z.[6] Whichever officer packed Annabel's belongings allegedly failed to provide the mandatory packing slip. *Id.* Then, on February 4, 2014, Defendants Haggerty, Robbinson, Webster, and Stewart did not remove Annabel from the observation cell in time to attend a scheduled law library session. *Id.* Further, Robbinson "verbally harassed Plaintiff about the unjustified placement." *Id.*

Annabel contends that detention in the observation cell caused him extreme emotional distress and aggravated symptoms of PTSD. *Id.* at 364. While in an aggravated mental state, Annabel "flooded his cell, destroyed a mattress, and slit open a gash on his forehead from headbutting the cell door window[.]" *Id.* As a nurse attended to his wound, staff drew their Tasers and Lebron asked, "[A]re we supposed to be happy that [Erichsen's] off duty?" *Id.* The COs mocked Annabel that Erichsen would soon return. *Id.*

The prison transferred Annabel to the Crisis Stabilization Unit at Woodland Correctional Facility ("WCF") for Annabel's recovery from his mental breakdown. *Id.* On February 6, 2014, Plaintiff mailed two grievances to Inspector Steece at MCF describing: (i) Brown locking him in a shower and threatening him, (ii) interacting with his psychiatrist, (iii) staff locking him in suicide observation, (iv) missing his library session because of staff delay, and (v) the officers' harassing him while the nurse tended to his head wound ("Steece Grievances 3 and 4"). *Id.* at 364.

Less than one week later, Annabel mailed another grievance to Steece and the previous grievances, which were returned as undeliverable. *Id.* The new grievance

_____

[6] Annabel apparently filed an additional grievance for the incident, ARF-14-03-0581-19z. A record of that grievance does not exist. Regardless, only the MRF grievance relates to the defendants. The Court, therefore, will address only that grievance.

identified Warden Kenneth Romanowski and Deputy Wardens George Stephenson and Darrell Steward as responsible for implementing a "policy or custom of deliberate indifference and negligence" by allowing the staff to "retaliate with overt impunity" against Annabel, by awarding Erichsen "an unreasonable paid vacation for the assault," and by encouraging and condoning the staff's campaign of misconduct. *Id.* at 364 ("Steece Grievance 5"). Plaintiff did not receive grievance identifiers or Step I Responses from Steece or Taylor for Steece Grievances 3, 4, or 5. *Id.* at 365. That failure allegedly prevented any appeal. Steece did receive a consent for medical information from Annabel to investigate Annabel's placement in the suicide observation cell. *Id.*

On February 20, 2014, Annabel was transferred from WCF to Gus Harrison Correctional Facility. ECF 58, PgID 36. Then, in May 2014, Annabel was transferred to Ionia Correctional Facility. *Id.*

In the subsequent months, and throughout his transfers, Annabel submitted inquiries to Taylor, Romanowski, and Steece. In particular, Annabel sent Taylor six letters asking for Step II Appeal forms and for updates on unprocessed grievances. *Id.* Annabel's inquiries went largely unanswered.

Annabel filed suit and alleged the following claims:[7]

Count I: Erichsen violated Annabel's Eighth Amendment rights by using excessive force;

Count II: Brown violated Annabel's Eighth Amendment rights by using excessive force;

---

[7] For simplicity, the Court will assign Count numbers to Annabel's "Statement of Claims." *See* ECF 49, PgID 366–67.

Count III: Erichsen, Oden, Weberg, Jordan, Lebron, Loftis, Robbinson, Haggerty, Taylor, Webster, and Stewart violated Plaintiff's First Amendment rights by a campaign and conspiracy to retaliate and violated the Eighth Amendment by causing him physical and psychological pain;

Count IV: Weberg and Oden violated Plaintiff's Eighth Amendment rights by creating an excessive risk of harm by attempting to incite prisoner to assault Annabel by calling him a "snitch";

Count V: Romanowski, Steward, Stephenson, Haggerty, and Taylor violated Plaintiff's Eighth Amendment rights by authorizing, approving, and encouraging their subordinates' retaliatory campaign after Annabel filed the Assault Grievance and ensured that subordinate purposefully mishandled the grievance process;

Count VI: Romanowski, Steward, Stephenson, Haggerty, Taylor, Erichsen, Brown, Jordan, Lebron, Oden, Weberg, Loftis, Robbinson, Webster, and Stewart committed intentional infliction of emotional distress and conspiracy;

Count VII: Erichsen committed state law assault and battery;

Count VIII: Brown committed state law assault and battery;

Count IX: Oden and Weberg committed the tort of slanderous defamation by announcing Plaintiff that was a "snitch"; and

Count X: Romanowski, Steward, Stephenson, and Taylor committed the state law torts of negligence and gross negligence by failing in their duties to supervise and investigate, and mishandling the grievance process.

## STANDARD OF REVIEW

Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[8] A fact is material for purposes of summary judgment if its resolution would establish or refute an "essential element[] of a cause of action or defense asserted by the parties[.]" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the Court must view the facts and draw all inferences in the light most favorable to the non-moving party. *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And although the Court may not make credibility judgments or weigh the evidence, *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015), a mere "scintilla" of evidence is insufficient to survive summary judgment;

---

[8] The MDOC defendants filed a motion for summary judgment or motion to dismiss. In *Jones v. Bock*, the Supreme Court determined that the PLRA required defendant prisons to "plead and prove" failure to exhaust as an affirmative defense. 549 U.S. 199, 204 (2007). In light of that decision, questions remain about whether the affirmative defense must be raised under Rule 12 or Rule 56. The Sixth Circuit implicitly acknowledges the propriety of using the summary judgment standard. *See generally Mattox v. Edelman*, 851 F.3d 583 (6th Cir. 2017). Practically speaking, the summary judgment standard seems appropriate here because prisons must offer the prison grievance policy and administrative record to support their affirmative defense of failure to exhaust. At least one other circuit determined that a motion for summary judgment was the *only* appropriate device for deciding exhaustion in cases governed by the PLRA. *See Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014). Although Annabel's complaint references the MDOC's policy and administrative record and the Court could consider exhaustion under Rule 12's standard, the Court will apply the summary judgment standard.

"there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252.

## DISCUSSION

I.   <u>Exhaustion</u>

A. Legal Standard

Pursuant to the Prison Litigation Reform Act ("PLRA"), a prisoner must exhaust administrative remedies before filing suit. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). But a prisoner is not required to plead exhaustion; rather, a prison must raise failure to exhaust administrative remedies as an affirmative defense. 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 212 (2007). At summary judgment, the prison must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies. *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

The PLRA "requires proper exhaustion." *Woodford*, 548 at 93. A federal exhaustion standard does not exist. So, a prisoner properly "exhausts his remedies when he complies with the grievance procedures put forward by his correctional institution." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Jones*, 549 U.S. at 217–19); *see also Woodford*, 548 U.S. at 90 (describing proper exhaustion in administrate law as requiring "compliance with an agency's deadlines and other critical procedural rules"); *see further Napier v. Laurel Cty.,* 636 F.3d 218, 224 (6th Cir. 2011) (stating "a prisoner must do what *is* required by the grievance policy"). A prisoner's "[f]ailure to file an administrative grievance within proper time limits precludes proper exhaustion and thus bars the claim in federal court." *Reynolds-Bey v. Harris-Spicer*, 428 F. App'x 493, 500 (6th Cir. 2011) (citing *Woodford*, 548 U.S. at 93); *see also Pool v. Klenz*, No. 17-3426,

2018 WL 1989637, at *2 (6th Cir. Jan. 17, 2018) (citing *Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009) ("*Woodford* makes clear that a prisoner cannot satisfy the [Prison Litigation Reform Act] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance.")).

To exhaust his administrative remedies, therefore, a prisoner must comply with the prison's grievance procedures. If a prisoner fails to do so, courts typically dismiss unexhausted claims and address the merits of exhausted claims. *Jones*, 549 U.S. at 220–24.

The PLRA's exhaustion requirement accomplishes three ends. Exhaustion "allow[s] prison officials a fair opportunity to address grievances on the merits, to correct prison errors that can and should be corrected[,] and to create an administrative record for those disputes that eventually end up in court." *Mattox*, 851 F.3d at 591.

Federal courts may address unexhausted claims in two situations, however. First, courts may consider unexhausted prisoner claims if a prison declined to enforce its "own procedural requirements and opt[ed] to consider otherwise-defaulted claims on the merits[.]" *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).

Second, courts may excuse a prisoner's failure to exhaust if the administrative remedies were not available. Before addressing whether administrative procedures were unavailable, the prisoner must present evidence of his affirmative efforts to comply with the procedures. *Rivers v. Turner*, No. 16-4241, 2017 WL 9249945 (citing *Napier*, 636 F.3d at 224). The prisoner's affirmative efforts, even if unsuccessful, must be "sufficient under the circumstances." *Lee v. Wiley*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

A grievance procedure is unavailable if: (1) the procedure offers "a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) no ordinary prisoner could navigate the procedures; or (3) prison officials "through machination, misrepresentation, or intimidation" "thwart inmates from taking advantage" of the procedures. *Ross v. Blake*, 136 S. Ct. 1850, 1858–60 (2016).

Finally, a reviewing court may "dismiss [an] underlying claim without first requiring the exhaustion of administrative remedies" if the claim "fails to state a claim upon which relief can be granted." 42 U.S.C. § 1997e(c)(2).

B. MDOC Grievance Policy

MDOC Policy Directive 03.02.130 ("Policy") provides two grievance procedures, which the Court will refer to as the Primary and Alternative Grievance Procedures.

*1. Primary Grievance Procedure*

The Policy's primary grievance procedure contains four parts. First, within two business days of a grievable issue, the prisoner must attempt to resolve the issue with the staffer. ECF 43-2, PgID 245, ¶ P. Second, within five business days of any attempted and unsuccessful oral resolution, the prisoner must send a "Step I grievance" to the Step I Grievance Coordinator of the facility where the grievable issue occurred. *Id.* at 245–46, ¶¶ P, R, V. The Step I grievance must include the "[d]ates, times, places, and names of all those involved" in the grievable issue. *Id.* at 245, ¶ R. Usually, the prison must respond within fifteen business days of receipt of the grievance. *Id.* at 246, ¶ X.

Third, the prisoner may file a Step II grievance with the facility's Step II Grievance Coordinator if (i) he is dissatisfied with the Step I response, or (ii) he did not receive a timely response. *Id.* at 247, ¶ BB. The prisoner must file a Step II grievance form within

ten business days of (i) receipt of the Step I response, or (ii) expiration of the prison's time to respond. *Id.* Ordinarily, the prison must respond to a Step II grievance within fifteen business days of receipt of the grievance. *Id.* at 247, ¶ CC.[9]

Fourth, the prisoner may send a Step III grievance to the prison's Grievance and Appeals Section if (i) he is dissatisfied with the Step II response, or (ii) he did not receive a timely response. *Id.* at 248, ¶ FF. Absent any extensions, therefore, a prisoner's Step III grievance will be filed within no more than fifty-seven business days.[10]

The Policy's language requires the prisoner to file his grievance at the *earlier* of either ten business days after receipt of a Step I or II response or ten business days after a response date passed.[11] The relevant language states: "the grievant must [file an appeal] . . . within ten business days after receiving" a response "or, if no response was received, within ten business days after the date the response was due[.]" ECF 43-2, PgID 247, ¶ BB (Step II Grievance) and ¶ FF (Step III Grievance).

If the Policy allowed the prisoner to file a grievance at the *later* of the two dates, the first clause—"within ten business days after receiving" a response—would be

---

[9] For Step I or II responses outside the purview of the Internal Affairs Division, the prison may receive, at maximum, an extension of fifteen business days. ECF 43-2, PgID 246, ¶ S.

[10] The Court includes a timeline graphic of the MDOC's grievance policy absent any extensions:



[11] This wrinkle reappears throughout the case; Defendants rely upon this rule for nearly all of their exhaustion arguments.

superfluous. Ten business days from the response's due date would always be the later date—regardless of whether the prisoner received a response on the due date. The Policy therefore requires a grievant to file a Step II or III grievance within twenty-five days of the prison's receipt of the grievance.

So, if Annabel received an MDOC response after the tolling of twenty-five business days, any response to that tardy prison response would not properly exhaust his claims. The Court may consider the unexhausted claims, however, if the prison responded to a procedurally-defaulted grievance on the merits, *see Reed-Bey*, 603 F.3d at 325, or if the grievance process was unavailable, *see Ross*, 136 S. Ct. at 1858–60.

### 2. Alternative Grievance Procedure

An alternative method for filing grievances exists. *See id.* at 245, ¶ Q. A grievant may file a Step I grievance "directly with the inspector of the institution at which the prisoner is housed instead of with the grievance coordinator" if the grievant alleges "conduct which falls under the jurisdiction of the Internal Affairs Division." *Id.* The Internal Affairs Division retains jurisdiction for six types of allegations: (1) cases of staff sexual misconduct, (2) cases of staff overfamiliarity, (3) allegations constituting a felony or misdemeanor, (4) allegations of infractions of work rule or policy of significant magnitude, (5) conduct requiring an employee's discharge, and (6) allegations of discriminatory harassment. ECF 60-2, PgID 499–500. If the Manager of the Internal Affairs Division determines "that the grievance is not within the jurisdiction of the Internal Affairs Division," the grievance shall "be processed as a Step I grievance in accordance with this policy." ECF 43-2, PgID 245, ¶ Q.

Regardless of his selected method, the prisoner must properly exhaust his claims before filing a lawsuit.

## II. Exhaustion: Annabel's Grievances

Macomb Correctional Facility recorded fourteen grievances filed by Annabel and assigned them grievance identifiers ("Recorded Grievances"). Annabel also filed numerous grievances not contained in MDOC's records: one that received an identifier, MRF-14-03-0373-19z, and five that never received identifiers after he mailed them to Inspector Steece. The Court will refer collectively to these grievances as "Unrecorded Grievances."

### A. Recorded Grievances

MDOC records reflect that Annabel filed fourteen grievances while incarcerated at MCF. Ten grievances do not relate to the present lawsuit.[12] MDOC's records, therefore, contain four grievances either explicitly mentioned or implicitly referenced in Annabel's complaint. The Court now addresses whether Annabel exhausted those four grievances.

#### 1. Assault Grievance

In MRF-13-12-1179-26a ("Assault Grievance"), Annabel alleged that, on December 2, 2013, Defendant Jorg Erichsen assaulted him in the showers. Annabel

---

[12] Six grievances predate the allegations in the complaint. *See* MRF 10-01-0014-17a, MRF-10-02-0241-17a, MRF-10-05-0755-15d, MRF 10-07-9810-28c, MRF 10-07-0980-17b, and MRF 10-08-1080-17b.

Three grievances postdate, but do not relate to, the lawsuit's allegations. *See* ECF 43-3, PgID 308-11 (MRF-13-12-1254-28e (alleging that law librarian failed to provide legal supplies)); *id.* at 293–97 (MRF 14-01-0039-28e (same)); and *id.* at 303–07 (MRF-14-02-0155-01h (alleging that Annabel purchased, but never received, deodorant from the storekeeper)).

Finally, one grievance alleged that Arus Moses and RUM Grant failed to provide Annabel with grievance forms. *See* ECF 43-3, PgID 283–87 (MRF-14-02-0154-28e). Neither Moses nor Grant are defendants.

exhausted the Assault Grievance. Annabel sought to orally resolve the incident, timely filed a Step I Grievance, and timely filed a Step II grievance. ECF 43-3, PgID 320–21.

Annabel filed his Step III grievance within ten business days of receiving the prison's Step II response. *Id.* at 320. It is unclear whether Annabel filed his Step III grievance at the earlier of the two available dates. *See supra* Part I.B.1. Regardless, the prison waived any procedural error by responding on the merits. *See* ECF 43-3, PgID 319; *see also Reed-Bey*, 603 F.3d at 325. Annabel, therefore, exhausted the Assault Grievance.

### 2. Snitch Grievance

In MRF-13-12-1225-17b ("Snitch Grievance"), Annabel alleged Defendant CO Oden, CO Weberg, and one unknown officer called Annabel a "snitch" in an attempt to provoke violence against him by other prisoners. The parties agree that Annabel properly exhausted the Snitch Grievance.[13]

### 3. Forms Grievance

In MRF-14-03-0371-28e ("Forms Grievance"), Annabel alleged that Defendant Grievance Coordinator Eutrilla Taylor failed to provide him with appeals forms. Annabel did not exhaust this claim. First, Annabel's Step I Grievance was untimely. Annabel listed February 24, 2014 as the date of the incident, but did not file the grievance until March 6, 2014. That date is eight business days after the incident. The Policy requires proper filing within seven business days. *See supra* n.11.

---

[13] *Compare* ECF 49, PgID 360 (noting that a witness was not called "[t]hrough all three steps") *with* ECF 99, PgID 783 ("It would appear that Annabel properly exhausted his administrative remedies as to C/O Oden."). In any event, Defendants do not raise exhaustion as an affirmative defense for the events mentioned in the Snitch Grievance.

Second, even if Annabel's Step I filing were timely, Annabel's Step III grievance was untimely. The prison responded to Annabel's Step I grievance in April 2014. Annabel filed a timely Step II grievance on April 25, 2014. The prison did not respond and Annabel filed a Step III grievance. The prison did not receive the Step III grievance until August 8, 2014.[14]

Annabel points to his multiple transfers as reasons for his untimely Step III grievance. ECF 58, PgID 437. MDOC transferred Annabel on February 6 and 20, 2014 and on May 13, 2014. *Id.* Although the Policy prevents denial of a grievance "if there is a valid reason for the delay" such as "transfer", but none of Annabel's transfers can reasonably account for his three-month delay in filing his Step III grievance. ECF 43-2, PgID 244, ¶ G. Annabel filed his Step II grievance on April 25, 2014. He had twenty-five business days—fifteen business days for the prison's response and ten business days from that due date—until May 16, 2014 to file his Step III grievance. When MDOC transferred Annabel on May 13, 2014, ECF 43-3, PgID 299, the prison's response was already tardy and Annabel had only three days to file his grievance. Although a transfer may be a valid reason for a delay, a transfer three days before the due date of a grievance is not a valid reason for a three-month delay in filing. The prison correctly denied the grievance as untimely. For both these reasons, therefore, Annabel failed to exhaust the Forms Grievance.

---

[14] The Step III response states the prison received the Step III grievance on October 3, 2014, ECF 43-3, PgID 299, but the timestamp on the file indicates the prison received it on August 8, 2014, *id.* at 300.

### 4. Comment Grievance

In MRF-14-01-0056-28e ("Comment Grievance"), Annabel alleged that non-party CO Jordan commented about Erichsen's incident to Annabel. On December 29, 2013, Annabel filed a grievance stating that few people knew the information Jordan asked him about and that the comment exemplified Erichsen's communication "with fellow officers to incite confrontation in an attempt to harass and retaliate against" Annabel. ECF 43-3, PgID 291. Taylor rejected the grievance as vague. *Id.* at 292.

On June 13, 2014, Annabel filed his Step II grievance representing that his several transfers delayed the response. The prison received the grievance on August 5, 2014. Fifteen business days after that date is August 26, 2014. Annabel, therefore, had ten more business days—until September 10, 2014—to file his Step III grievance. Annabel did not file a timely Step III grievance.

The prison, however, waived the procedural defect by addressing Annabel's Step II grievance on the merits, and returned the grievance to Annabel on February 5, 2015. *Id.* at 290. Annabel filed a timely Step III grievance, which the prison incorrectly denied as untimely. Annabel, therefore, properly exhausted the Comment Grievance.

### B. Unrecorded Grievances

MDOC's records do not contain all grievances Annabel identified, however. The Court now addresses whether Annabel exhausted the Unrecorded Grievances.

### 1. Cell Search Grievance

In MRF-14-03-0373-19z ("Cell Search Grievance"), Annabel alleged that in early February 2014 unknown officers packed his property, discarded his eyeglasses and literature, and possibly planted contraband. ECF 49, PgID 363. The MDOC records make

passing comment about the Cell Search Grievance: on October 7, 2014, the prison "[r]eturned to P[risoner] under cover letter requesting Step I & II documents." ECF 43-3, PgID 281. Defendants did not properly prove their affirmative defense that Annabel did not exhaust the Cell Search Grievance.

### 2. Steece Grievances 1 and 2

On January 14, 2014, Annabel submitted Steece Grievance 1 concerning a threat made by COs Jordan and Lebron. Then, on January 20, 2014, Annabel filed Steece Grievance 2 alleging that CO Loftis told him: "I'm not going down like [Erichsen] did." ECF 49, PgID 361. As Annabel's documents demonstrate, ECF 58, he failed to exhaust administrative remedies for Steece Grievances 1 and 2.

### 3. Steece Grievances 3, 4, and 5

Annabel failed to properly exhaust Steece Grievances 3, 4, and 5.

On February 6, 2014, Plaintiff mailed two grievances to Inspector Steece ("Steece Grievances 3 and 4") at MCF describing multiple transgressions by Brown, his psychiatrist, and numerous other officers. ECF 49, PgID 364. On February 13, 2014, Plaintiff mailed another grievance to Steece and included Steece Grievances 3 and 4. The new grievance identified Warden Kenneth Romanowski and Deputy Wardens George Stephenson and Stewart as responsible for condoning the officers' misconduct. *Id.* ("Steece Grievance 5").

Annabel could pursue two avenues to file his grievances: (1) submit a grievance to the Grievance Coordinator of the institution where the incident occurred; or (2) submit a grievance to the Inspector of the Institution in which the prisoner resided (if not the same

institution as the location of the incident). Here, Annabel's Steece Grievances 3, 4, and 5 failed to comply with the Policy's procedures.

Annabel mailed Steece Grievances 3, 4, and 5 to the inspector of MRF, rather than the inspector of the "institution at which the prisoner is housed[.]" ECF 43-2, PgID 245.[15] By choosing to mail Steece Grievances 3, 4, and 5 to the inspector at a different facility, Annabel failed to follow the Policy and thus failed to exhaust his administrative remedies as to these claims.[16]

As the Supreme Court recognized, the PLRA's mandatory exhaustion language "means a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Id.* at 1857. The Court, therefore, may not excuse Annabel's failure to follow the Policy's procedure and concomitant failure to exhaust.

Any of Annabel's failures to exhaust his administrative remedies may be excused, however, if the grievance procedures were unavailable to him. The Court now turns to that question.

C. Availability of Grievance Procedure

A court may excuse a prisoner's failure to exhaust administrative remedies if they were unavailable to him. Before considering availability of process, the Court must

---

[15] Annabel submitted records of his purchase of postage to mail his grievance to Inspector Steece. *See* ECF 48, PgID 464, 467, 471–73.

[16] Magistrate Judge Davis's Report and Recommendation noted that "plaintiff's exhibits demonstrate, he did not 'file a Step I grievance directly with the inspector of the institution at which the prison [was] housed' but mailed his documents to an Inspector at a different facility." ECF 91, PgID 733 (citing, e.g., ECF 58, PgID 464).

determine whether a prisoner took "affirmative efforts to comply with the administrative remedies[.]" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting *Napier v. Laurel Cty.*, 636 F.3d 218, 223 (6th Cir. 2011)). If the prisoner's efforts were "sufficient under the circumstances," then the Court considers whether the procedure was available.

A grievance procedure is unavailable if: (1) the procedure offers "a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) no ordinary prisoner could navigate the procedures; or (3) prison officials "thwart inmates from taking advantage" of the procedures "through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1858–60. Under such circumstances, the PLRA's exhaustion requirement "poses no bar." *Id.*

Annabel failed to exhaust properly the Forms Grievance and Steece Grievances 1–5. The Court addresses whether (1) Annabel took affirmative efforts to comply with the grievance procedure and (2) if so, whether his failure resulted from the grievance procedure's unavailability.

### 1. Forms Grievance

The Court will not excuse Annabel's failure to exhaust the Forms Grievance because the procedure was available to him. Annabel made affirmative efforts to comply with the grievance procedure for the Forms Grievance, but failed to timely file a Step I or Step III grievance. Annabel fails to make a showing that the procedure offered a simple dead end, could not be navigated by an ordinary prisoner, or was thwarted by prison officials. *See Williams v. White*, No. 17-5627, 2018 WL 739383 (6th Cir. Feb. 7, 2018) (placing the burden on the prisoner to allege facts that demonstrate the unavailability of

the grievance procedure). The procedure, therefore, was available and the Court will not excuse Annabel's failure to exhaust the Forms Grievance.

### 2. Steece Grievances 1 and 2

Annabel made sufficient affirmative efforts under the circumstances to comply with the grievance procedure by filing Steece Grievanecs 1 and 2 "with the inspector of the institution at which the prisoner [was] housed instead of with the grievance coordinator[.]" ECF 43-2, PgID 245, ¶ Q. The remaining question, therefore, is whether the grievance procedure was available to Annabel. It was not.

Defendants maintain that Annabel failed to "explain or demonstrate how his grievances warranted Internal Affairs scrutiny[.]" ECF 60, PgID 493. MDOC Defendants overstate the burden the Policy places on a prisoner-grievant. A prisoner may file a grievance with the inspector of his institution if the alleged conduct is within the Internal Affairs Division (IAD), which includes, among other issues, allegations of infractions of work rule or policy of significant magnitude, or conduct requiring an employee's discharge 60-2, PgID 499–500. Even if the prisoner fails to state an issue within the jurisdiction of the IAD, the IAD's Manager makes that determination and then "process[es] [the grievance] as a Step I grievance in accordance with this policy." ECF 43-2, PgID 245, ¶ Q. The burden, therefore, shifts to the prison to ensure that the grievance enters the proper channels of grievance review.

Annabel could have reasonably expected that the statements by the COs Jordan, Lebron, and Loftis violated a work rule and created the perception of prison-wide impropriety. When the IAD's Manager determined the issue fell outside IAD's jurisdiction, the grievance ought to have proceeded as a normal grievance. It did not. Prison personnel

failed to comply with the Policy and prevented Annabel from properly exhausting Steece Grievances 1 and 2. When prison staff ignore prison policy, the grievance procedure offers no more than "a simple dead end" that no ordinary prisoner could navigate. *Ross*, 136 S. Ct. at 1859. Moreover, Taylor's repeated letters addressing Annabel's many mailings, including those about Steece Grievances 1 and 2, ECF 58, PgID 441, 477–48, at least amounted to a misrepresentation that thwarted Annabel "from taking advantage" of the procedures. *Ross*, 136 S. Ct. at 1860. The grievance procedure, therefore, was unavailable and the Court will excuse Annabel's failure to exhaust Steece Grievances 1 and 2.

### 3. Steece Grievances 3, 4, and 5

The Court will not excuse Annabel's failure to exhaust Steece Grievances 3, 4, and 5. Annabel affirmatively failed to comply with the procedure by filing Steece Grievances 3, 4, and 5 with the inspector of an institution at which he was previously held. The PLRA "requires proper exhaustion," *Woodford*, 548 U.S. at 93, which occurs when a prisoner complies with a prison's procedure, *Mattox*, 851 F.3d at 590. The PLRA's language forecloses "judicial discretion" to consider special circumstances. *Ross*, 136 S. Ct. at 1850, 1857. The Policy offered more than a dead end, could be navigated by an ordinary prisoner, and was not thwarted by prison officials. "[N]othing in the record suggest[s] that" if Annabel followed the Policy, "prison officials [would have] fail[ed] to provide him any relief he might deserve." *Williams*, No. 17-5627, 2018 WL 739383, at *2. Because the procedure was available and Annabel failed to follow the Policy, the Court cannot excuse Annabel's failure to exhaust Steece Grievances 3, 4, and 5.

III.    <u>Merits of Claims Properly Before the Court</u>

In sum, six grievances warrant review on the merits.[17] The Court will address them in turn.

A. Assault Grievance

Because Defendant Jorg Erichsen is not a party to the pending motion for summary judgment, the Assault Grievance's merits is not properly before the Court and the Court will not address it at this time.

B. Snitch Grievance

The Snitch Grievance makes claims against COs Oden and Weberg, and an unknown CO.[18] Annabel contends that Oden's statement violated his Eighth Amendment rights "by creating an excessive risk of harm" by attempting to incite prisoners to assault him for snitching. ECF 49, PgID 366. The Eighth Amendment prohibits punishments involving "the unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). In determining whether a claim violates the Eighth Amendment, courts consider "the reason or motivation for the conduct, the type and excessiveness of the force used, and the extent of injury inflicted[.]" *Parrish v. Johnson*, 800 F.2d 600, 605 (6th Cir. 1986).

Here, Oden did not use force and did not inflict an injury. Annabel alleges only that Oden's comments *might* have been overheard by other inmates and *may* have prompted

---

[17] Annabel exhausted three grievances: the Assault Grievance, the Snitch Grievance, and the Comment Grievance. The prison did not properly raise its affirmative defense of non-exhaustion of the Cell Search Grievance. The prison's conduct made the grievance procedure unavailable for Steece Grievances 1 and 2.

[18] The Court terminated CO Weberg. *See* ECF 126. The unknown officer was not served.

them to attack him. Annabel claims that one fellow inmate heard the comment, and offered the inmate as a witness in his grievance process. Annabel does not allege that any other inmates overheard Oden's "snitch" comment or that, even if they did, that any other inmates threatened or attacked him. That allegation is not enough. *See Gonzales v. Ryan*, 127 F.3d 1102 (6th Cir. 1997) (Table) (finding no Eighth Amendment violation when the prisoner alleged that a "snitch" comment "*may* have been overheard by other inmates and may cause other inmates to want to harm him").[19] The claim, therefore, fails to allege an Eighth Amendment violation.

Annabel further claims that Oden committed the state law tort of slanderous defamation by calling him a snitch. *Id.* at 367. Michigan's law of defamation includes four elements: "(1) a false and defamatory statement about the plaintiff; (2) an unprivileged communication to a third party;" (3) at least negligence by the publisher; and "(4) actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 527 (6th Cir. 2014) (citing *Mitan v. Campbell*, 474 Mich. 21 (2005)). Annabel cannot make out the first element. Although the term "snitch" carries a negative connotation, "snitch" means an informer.[20] Here, Annabel acted as an informer of Erichsen's alleged assault. Despite the word's pejorative tone, Oden's statement was

---

[19] The analysis would be different if Oden directly told other inmates that Annabel was a snitch and the other inmates then threatened or attacked him. *See Gonzales*, 127 F.3d at 1102 (referencing Tenth and Eight Circuit cases involving that fact pattern).

[20] *See Snitch*, <u>Oxford English Dictionary</u>, available at: http://www.oed.com/view/Entry/183315?rskey=z3UkfC&result=1&isAdvanced=false#eid (last accessed June 19, 2018).

not false. Annabel therefore cannot make out a claim for slanderous defamation under Michigan tort law.

C. Comment Grievance, Cell Search Grievance, and Steece Grievances 1 and 2

The remaining grievances relate to the following claims: (1) a campaign and conspiracy of First Amendment retaliation by Erichsen, Oden, Jordan, Lebron, Loftis, Haggerty, Taylor, Webster, and Stewart; (2) Eighth Amendment violation by Romanowski, Steward, Stephenson, Haggerty, and Taylor for allegedly authorizing, approving, or encouraging, their subordinates' retaliation; (3) intentional infliction of emotional distress by all Defendants; and (4) negligence or gross negligence by Romanowski, Steward, Stephenson, and Taylor for failing to supervise or for mishandling the grievance process. The Court addresses the merits of the claims now.

*1. Conspiracy of First Amendment Retaliation*

Annabel contends that eleven defendants conspired to violate his First Amendment rights through a campaign of retaliation. A retaliation claim entails three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The Court will address each element.

a. Protected conduct.

Annabel engaged in protected conduct. Annabel claims that the retaliatory conduct arose after he filed a grievance against Erichsen for an alleged assault. A prisoner's First

Amendment rights to free speech include an entitlement to "petition the state for redress of grievances." *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). Annabel's pursuit of a grievance against Erichsen, therefore, constitutes protected conduct.

b. Adverse action.

In the prison context, an adverse action is conduct that would deter a person of ordinary firmness from continuing to engage in protected activity. The Comment Grievance, Cell Search Grievance, and Steece Grievances 1 and 2 contain different allegations of adverse action. The Court addresses each in turn.

Annabel's Comment Grievance alleges that a non-party (CO Jordan) knew information that Annabel had disclosed to few individuals. He alleges that the comment indicated Erichsen's animus and Taylor's corruption. Plaintiff failed to establish that the alleged retaliatory act encapsulated in the Comment Grievance "amounted to more than a de minimis injury." *Hill v. Lappin*, 630 F.3d 468, 473 (6th Cir. 2010). That failure precludes a finding that the conduct in the Comment Grievance constitutes a sufficient adverse action to support a retaliation claim.

Annabel's Cell Search Grievance alleged that unknown, non-party prison staff searched his cell, discarded his belongings, and failed to follow proper protocol. Not "every objectionable act directed at a prisoner constitutes adverse action sufficient to deter a person of ordinary firmness from engaging in protected activities." *Reynolds-Bey*, 428 F. App'x at 503. As such, the "single search of a prison cubicle would not deter a person of 'ordinary firmness' from pursuing constitutional grievances." *Id.* (quoting *Tate v. Campbell*, 85 F. App'x 413, 417 (6th Cir. 2003)). The allegations contained in the Cell

Search Grievance therefore do not constitute adverse action sufficient to establish a retaliation claim.

Annabel's Steece Grievance 1 alleged that CO Jordan told Plaintiff that he could not attend a group meeting, that he "should have kept his mouth shut" about Erichsen, and that attending the group would result in a disciplinary sanction. ECF 49, PgID 360. Here, CO Jordan threatened to discipline Annabel if he attended the group meeting. The "mere potential threat of disciplinary sanctions is sufficiently adverse to support a claim of retaliation." *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018) (quoting *Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004)).

Annabel's Steece Grievance 2 claimed that CO Loftis told Annabel, "I'm not going down like [Erichsen] did." ECF 49, PgID 361. Ordinarily, verbal harassment cannot "deter a person of ordinary firmness from engaging in protected conduct. An inmate has no right to be free from verbal abuse, and minor threats do not rise to the level of a constitutional violation." *Smith v. Craven*, 61 F. App'x 159, 162 (6th Cir. 2003) (citing *Ivey v. Wilson*, 832 F.2d 950, 954–55 (6th Cir. 1987) and *Thaddeus-X*, 175 F.3d at 398). CO Loftis's comment inflicted no more than a de minimis injury and amounted to mere verbal harassment insufficient to prevent a person of ordinary firmness from engaging in further protected conduct.

c. Causal connection.

Annabel adequately alleged an adverse action sufficient to support a retaliation claim in Steece Grievance 1. At the final step, the Court must determine whether the adverse action relates to Annabel's protected activity of reporting Erichsen's alleged assault. The Court analyzes the issue through a burden-shifting framework. First, the

plaintiff must show that the protected conduct "was a motivating factor behind any harm[.]" *Thaddeus-X*, 175 F.3d at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Then, the defendant can show that he would have taken the same action in the absence of the protected activity. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001).

Here, CO Jordan's alleged reference to Annabel's grievance against Erichsen immediately preceded CO Jordan's threat of disciplinary sanction if Annabel attended his group meeting. Annabel's allegations sufficiently show that his protected activity motivated CO Jordan's threat.

CO Jordan maintained only that Steece Grievance 1 was not exhausted. He therefore did not present evidence that he would have prevented Annabel from attending the group meeting notwithstanding Annabel's grievance against Erichsen. CO Jordan therefore is not entitled to summary judgment on this claim.

### 2. Eighth Amendment Violation—Failure to Supervise

Section 1983 liability for supervisors cannot be based on mere respondeat superior; rather, a supervisor's failure to supervise, control, or train subordinates is actionable only if the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cty.*, 668 F.3d 869, 874 (6th Cir. 1982)). At a minimum, therefore, a plaintiff must show the supervisor "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct" of the offending officers. *Id.* The showing must rely upon each government official's "own individual actions[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

First, there is no evidence in the record that Defendants Haggerty or Taylor have a supervisory role over Corrections Officers. They cannot be liable on a failure to supervise theory.

Second, as for Defendants Romanowski, Steward, and Stephenson, Annabel makes only conclusory allegations. Annabel filed a grievance against Romanowski, Steward, and Stephenson "for a policy and custom of deliberate indifference and negligence" to allow MRF staff to retaliate against him for informing on Erichsen. ECF 49, PgID 364. Then Annabel states Romanowski, Steward, and Stephenson implicitly authorized, approved, condoned, or encouraged their subordinates' retaliatory campaign. *Id.* at 366. Annabel's complaint lacks factual allegations demonstrating Romanowski, Steward, or Stephenson's personal involvement in the alleged conduct or other facts tending to show they acquiesced in unconstitutional conduct.

### 3. Intentional Infliction of Emotional Distress

Annabel further alleges that the Defendants engaged in intentional infliction of emotional distress (IIED). To establish an IIED claim, a plaintiff must prove the following elements: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577 (2004). The complained-of conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

Annabel does not present evidence of extreme or outrageous conduct by any of the MDOC Defendants.[21] There are no factual allegations of any conduct by Warden Romanowski, Deputy Wardens Steward or Stephenson, or Mental Health Therapist Webster. COs Brown and Robbinson were not served, and Annabel did not contest judgment in favor of CO Weberg.

Annabel does allege facts regarding six MDOC Defendants. He alleges that Haggerty and Stewart failed to remove him from observation in time for a scheduled law library session. He avers that Taylor denied one of his grievances as vague and failed to provide grievance identifiers or appeals forms. He also claims that Jordan threatened him about attending a group activity, Lebron asked whether the COs should be happy the prison removed Erichsen from duty, and Loftis stated he was not going down like Erichsen did. None of these actions are "so extreme in degree" to be "beyond all possible bounds of decency." Summary judgment is therefore proper on the claim.

### 4. Negligence or Gross Negligence—Failure to Supervise

A § 1983 "claim of failure to supervise" cannot be based on simple negligence. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989). A plaintiff must show that a supervisor directly participated in, implicitly acquiesced in, or authorized unconstitutional conduct. *Id.* (quoting *Hays*, 668 F.2d at 874). For the same reasons discussed *supra*, sec. III.C.2, Annabel has not alleged facts sufficient to show Romanowski, Steward, Stephenson, or Taylor participated in, acquiesced in, or authorized unconstitutional conduct. Summary judgment is therefore proper on the claim.

---

[21] The claim does include Jorg Erichsen, but Erichsen was not a party to the MDOC Defendants' motion for summary judgment.

IV.   Conclusion

In sum, Annabel's claims against Defendant Jorg Erichsen and his First Amendment retaliation claim against CO Jordan remain. All other claims against the MDOC Defendants will be dismissed with prejudice. Annabel's claims against COs Brown and Robbinson—who were not served—were dismissed without prejudice. Annabel's claims against CO Weberg were dismissed with prejudice.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that MDOC Defendants' motion for summary judgment [99] is **GRANTED IN PART AND DENIED IN PART**.

This is not a final order and does not close the case.

**SO ORDERED**.

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: July 17, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 17, 2018, by electronic and/or ordinary mail.

s/ David Parker
Case Manager